

U.S. Department of Justice

*Fraud Section, Criminal Division, U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

KAC/DGR
F. #2022R00989

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 1, 2024

By ECF

The Honorable Hector Gonzalez
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Rashawn Russell
                 Criminal Docket No. 23-152 (HG)

Dear Judge Gonzalez:

      The government respectfully submits this letter in connection with the sentencing of defendant Rashawn Russell.

      For nearly two years, Russell defrauded about thirty investors out of $1.5 million. He betrayed their trust and left many in financial distress. Russell exploited his position as a Wall Street investment banker and licensed broker to lure victims into investing in his cryptocurrency fund. Russell targeted close friends, classmates, and colleagues to invest with him and falsely promised that he would invest their money in cryptocurrency and that investors would earn large, and sometimes guaranteed, returns. In truth, however, Russell misappropriated much of the investors' funds and used them for his personal benefit, to gamble, and to repay other investors. To conceal his fraud, Russell sent fabricated bank documents to investors and repeatedly lied to investors, promising that they would be paid.

      Around the same time as his cryptocurrency fraud, Russell also stole at least 140 credit cards, debit cards, and identification cards from unsuspecting victims. Often, Russell stole from unlocked gym lockers throughout New York City and New Jersey and then used the bank cards to make fraudulent purchases and the identification cards to open online gambling accounts in victims' names. Displaying no remorse, Russell continued his identity theft scheme after pleading guilty.

      Russell's crimes are serious and merit a substantial term of incarceration.

I.    Factual and Procedural Background

   A.   Russell's Cryptocurrency Investment Fraud Scheme

Between November 2020 and August 2022, Russell engaged in a scheme to defraud investors by inducing them to invest with him based on false promises that, among other things, he would use the investors' assets for cryptocurrency investments and that the investors would earn large, and sometimes guaranteed, returns from those cryptocurrency investments. In truth, much of the investors' assets were misappropriated by Russell and used for his personal benefit, to gamble, and to repay other investors. Russell repeatedly failed to repay investors' principal investments and failed to provide investors with promised rates of return.

Russell called his cryptocurrency investment fund the R3 Crypto Fund. Russell solicited investments from numerous individuals, including his close friends, former college classmates, and former colleagues. When soliciting investments, Russell, at times, represented that he worked in investment banking and was a licensed broker. At times, he also claimed that he had developed a successful strategy to trade "altcoin" cryptocurrencies and that he had earned returns for investors in excess of 100% over previous three-month periods.

To induce some investors to invest with him, Russell falsely promised the investors that they were guaranteed returns or that they were guaranteed to recoup their investment principal. Russell often memorialized these false promises in written contracts. For example, Russell misrepresented to multiple investors that they would: (a) receive a guaranteed fixed return on their investment after three months with a 25% guaranteed return; or (b) receive the total return generated by their investment after three months, minus a management fee, often 20%, that would be paid to Russell. Russell also falsely promised to certain investors that they would receive their principal investment back regardless of the actual performance of the investment.

Russell often encouraged investors to continue investing with him by "rolling over" or reinvesting their principal investments, and any purported returns, when a typical three-month investment period ended. Russell often encouraged investors to "roll over" their investments because Russell did not have sufficient funds to repay investors and was attempting to delay the discovery of his investor-fraud scheme.

Although Russell transferred at least some investor funds into a cryptocurrency account to trade and repaid a small number of investors, on many occasions, after receiving investor funds, Russell did not invest them in cryptocurrency as promised. Instead, he diverted those funds to, among other things, gamble both online and in-person at a casino, to repay earlier investors through "Ponzi" payments, and fund personal expenses.

Russell misled certain investors and prospective investors about the status of their investments by fabricating financial documents. For example, in February 2021, Russell texted an investor a fabricated image of a Russell-controlled bank account showing a purported balance of approximately $355,000. In truth, the bank account had a balance of no more than about $35,000 at the time. Later, he texted another investor a fabricated bank statement purporting to show about $1.2 million in one of Russell's bank accounts. In truth, this account had a balance of only $162. Russell also sent some investors images purporting to show that Russell's cryptocurrency fund was successful and worth millions of dollars. For example, in March 2022,

2

Russell texted an investor a fabricated image purporting to show that his cryptocurrency fund was worth over $2.8 million.

After certain investors requested to be repaid their investments, Russell also falsely told them that he had wired them money as repayments for their investments, and he sent them fabricated images of wire transfer confirmations to conceal his fraud scheme and delay additional questions from investors. Russell would often tell victims that the banks were to blame. In fact, Russell knew there was never enough money to cover the wires in the first place.

Russell's cryptocurrency fraud scheme caused at least $1.5 million in losses to nearly 30 investors. The total amount invested by a single investor ranged from a few thousand dollars to $295,000. Many investors suffered substantial financial hardship because of Russell's fraud.[1]

B. Russell's Access Device Fraud Scheme

Russell also engaged in a scheme to fraudulently obtain the bank cards and identification cards of others between approximately September 2021 and June 2023. He knowingly and with intent to defraud possessed at least 97 credit/debit cards and at least 43 identification cards. Russell took photos of many of these bank cards and identification cards at gyms in New York and New Jersey. Russell often took the bank cards and identification cards from unlocked lockers or unattended personal items.

At the time of Russell's arrest, on April 10, 2023, Russell had in his wallet a driver's license and a debit and credit card that he had stolen. During the arrest, law enforcement also seized Russell's iPhone, which contained numerous photos of stolen drivers' licenses and stolen bank cards. Most of the photos of stolen bank cards and identification cards were taken between February 1, 2023 to April 7, 2023. Russell used at least some of this stolen third-party information to open gambling accounts online. He also made fraudulent purchases using the bank cards he stole.

C. The Indictment

In April 2023, Russell was indicted on one count of wire fraud for his cryptocurrency investor fraud scheme. Dkt. 1.

D. The Court Places Russell on Home Detention Following a June 2023 Bail Hearing

In June 2023, the government requested that Russell be placed on home detention after uncovering evidence indicating that Russell was continuing to steal bank cards and identification cards after being arrested in this case and being on pretrial release. *See* Government's Motion to Modify Conditions of Release, Dkt. 14. As a result, following a bail revocation hearing, the Court

---

[1] Russell mistakenly claims that he "launched his company R3 Crypto Fund in April 2022[.]" Dkt. 33 at 8. In truth, Russell began soliciting investments in November 2020, as he admitted at the change of plea hearing, when Russell confirmed that "between November 2020 and August '22 . . . I did intentionally with intent to defraud investors through emails and electronic messages as part of my scheme for the R-3 Crypto Fund." Ex. D, Tr. 48:12-17 (Sept. 19, 2023 Transcript of Plea Hearing).

placed Russell on more restrictive conditions of release to include home detention with GPS monitoring. *See* June 12, 2023 Minute Entry.

### E.  The Guilty Plea

In September 2023—five months after being indicted—and pursuant to a written plea agreement, Russell pleaded guilty to one count of wire fraud in connection with his cryptocurrency fraud scheme and one count of access device fraud in connection with his credit card and identity theft scheme. Dkt. 26.

### F.  The Court Orders Russell Detained Following a February 2024 Bail Hearing

After pretrial services filed a violation report, the Court held another bail violation hearing on February 23, 2024. At the hearing, the government presented evidence that even after the June 2023 bail hearing and being placed on home detention, Russell continued his identity theft scheme. The Court concluded that "the most reasonable inference that can be drawn from the evidence that I have seen is that the Defendant, at a minimum, was attempting to engage in the same sort of crime that he has already been convicted of, using almost exactly the same mo[d]us operandi, of trying to gain access and then use that access to gyms to acquire access devices." Ex. A, Tr. 68:5-11. The Court therefore ordered Russell detained.

## II.  The Advisory Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the PSR with one exception—Russell should not receive credit for acceptance of responsibility. The applicable Guidelines range is therefore 87 to 108 months, based on a total offense level of 29 and Criminal History Category I.[2]

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Loss Amount of Greater than $1,500,000 and less than | +16 |
| Substantial Financial Hardship to Five or More Victims (§ 2B1.1(b)(2)(B)) | +4 |
| Abuse of Position of Trust (§ 3B1.3) | +2 |
| **TOTAL (87 to 108 months)** | **29** |

---

[2] On January 31, 2024, Probation issued the PSR and concluded that the total offense level is 26 and the Guidelines imprisonment range is 63 months to 78 months. *See* PSR ¶ 122. The government did not initially object to the PSR's inclusion of acceptance of responsibility credit. After the February 2024 bail violation hearing and the Court's order of detention, the government formally objected to the PSR's inclusion of acceptance of responsibility based on the newly uncovered information regarding Russell's post-guilty plea conduct.

4

As part of the plea agreement, Russell stipulated to the loss amount and stipulated that he caused substantial financial hardship to five or more victims. *See* Plea Agreement ¶ 2. The government therefore addresses only the remaining Guidelines provisions here.

A. <u>The Abuse of Position of Trust Enhancement Applies</u>[3]

Section 3B1.3 of the Guidelines provides for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]" "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." *See* § 3B1.3, Note 1. "The enhancement is warranted if the victim entrusted the defendant with discretionary authority that enabled the defendant either to commit a crime or evade detection." *United States v. Thorn*, 446 F.3d 378, 388 (2d Cir. 2006). For example, in *United States v. Hirsch,* the Second Circuit held that "[b]ecause [defendant] was a broker and investment advisor entrusted with investment discretion by his investors and because he had a fiduciary and personal relationship (rather than an arms-length relationship) with his investors, he held a position of trust." 239 F.3d 221, 228 (2d Cir. 2001). The Second Circuit also concluded the defendant abused his position of trust in a way that significantly facilitated his crime by using his discretion to make Ponzi payments, by misrepresenting to investors that investments were "safe," and discouraging investors from demanding their money. *Id; United States v. Paneras*, 222 F.3d 406, 412-13 (7th Cir. 2000) (applying enhancement to defendant who held himself out as a licensed investment broker).

Here, Russell similarly abused a position of private trust that significantly facilitated the commission and concealment of his investor fraud scheme. Investors entrusted Russell, a licensed broker, with the discretion to invest their funds in cryptocurrency as Russell saw fit. This included making decisions about which cryptocurrencies to purchase, what trades to make, and when to make them. Russell also had friendships—that went beyond an arms-length relationship—with many investors that predated any business dealings related to his cryptocurrency fund. Russell then abused this trust to lure investors into making investments and then reinvesting their funds. Russell contends that "the PSR does not establish sufficient facts to support that Mr. Russell was in fact not supervised" by others. Ex. B at 3 (PSR Objections). But there is absolutely no evidence that Russell was supervised by others—and Russell offers no evidence to the contrary. In fact, Russell's own sentencing memo states that his cryptocurrency fund was his own endeavor: "*Mr. Russell* launched *his* company . . . in April 2022 and starting securing investors from *his* network of friends and former colleagues." Dkt. 33 at 8 (emphasis added). The two-level enhancement for abuse of position of trust therefore applies.

---

[3] In preparing its calculation for the plea agreement, the government erroneously did not identify this enhancement. Although it was not included in the Guidelines estimate in the plea agreement, the Court should apply the correct Guidelines calculation set out in the PSR, with one exception discussed above as to Acceptance of Responsibility credit.

5

B. Acceptance of Responsibility Credit is Not Warranted

Section 3E1.1 of the Guidelines provides that a court may decrease the offense level by three levels "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense[.] The defendant bears the burden of establishing that he qualifies for acceptance of responsibility credit by a preponderance of the evidence. *United States v. Chu*, 714 F.3d 742, 747 (2d Cir. 2013); *United States v. Polanco*, 37 F. Supp. 2d 262, 265 n.5 (S.D.N.Y. 1999). "In determining whether a defendant qualifies" for acceptance of responsibility credit, "appropriate considerations include, but are not limited to . . . voluntary termination or withdrawal from criminal conduct[.]" §3E1.1, Application Note 1(B).

For example, where a defendant pled guilty to access device fraud—the same crime Russell pled guilty to here—and the defendant "continued to engage in credit card fraud" after he pled guilty, the Second Circuit held that the "post-plea criminal conduct gave the district court adequate basis not only to deny the three-level reduction for acceptance of responsibility, but also to impose a greater sentence in consideration of the 18 U.S.C. § 3553(a) sentencing factors." *United States v. Ali*, 461 F. App'x 46, 48 (2d Cir. 2012); *see also United States v. Chu*, 714 F.3d 742, 747–48 (2d Cir. 2013) (holding that defendant's post-plea, pre-sentencing conduct in "attempt[ing] to smuggle drugs into a detention center after pleading guilty to a drug-related offense can serve as a sufficient basis for a District Court to deny a sentence reduction for acceptance of responsibility."); *United States v. Mercado*, 81 F.4th 352, 353 (3d Cir. 2023) ("[W]hen a defendant continues to engage in criminal activity following a guilty plea, that post-plea conduct may bear on whether he has genuinely accepted responsibility for his crime of conviction.").

Russell should not receive acceptance of responsibility credit because he continued to engage in—or at least attempted to engage in—criminal conduct after pleading guilty by committing the same access device fraud for which he pled guilty. On January 31 and February 7, 2024, during times when Russell told pretrial services he would be attending Gamblers Anonymous meetings, video surveillance obtained from Crunch Fitness reflects that Russell gained entry to three different Crunch fitness locations under false pretenses by pretending to have lost his AirPods. This is the same chain of fitness centers where Russell illegally obtained bank cards and identification cards in the access device fraud scheme to which he has already pled guilty. Russell gained entry even though Crunch Fitness had informed him in May 2023 that he "will not be allowed to rejoin Crunch at this point, or in the future" based on Crunch receiving information that Russell had "illegally obtained another members personal information while visiting" Crunch Fitness. *See* Ex. C, Termination Email (May 26, 2023).

Additionally, Russell made a false statement under 18 U.S.C. § 1001 to his pretrial services officer on February 12, 2024, by falsely claiming that he went to Crunch Fitness to resolve an outstanding balance. When Russell's pretrial officer asked him whether he had been attending all his Gambling Anonymous meetings he "initially stated he attended all counseling sessions, but subsequently admitted, he misused his schedule." *See* Bail Violation Memo (Feb. 20, 2024). Moreover, when Russell's pretrial officer "asked [Russell] also why he was going to the Crunch Fitnesses, three separate locations . . . [Russell] stated that he had an outstanding balance of $200 and he needed to go to the specific location." Ex. A, Tr. at 10:2-5. Then, when his pretrial officer asked him "why he needed to go to three different locations . . . [Russell] noted that [Crunch Fitness] told him he had to go to separate locations." *Id.* at 10:5-7. Crunch Fitness had notified

6

Russell in May 2023 that his membership had been permanently revoked and the video surveillance presented at the bail hearing reflects that he was not attempting to resolve an outstanding balance. There is therefore sufficient evidence to find that Russell lied to his pretrial services officer when he told her he went to Crunch Fitness to resolve an outstanding balance on his account.

Russell contends that he "accepted responsibility by pleading guilty," *see* Ex. B at 1 (PSR Objections), but pleading guilty does not automatically entitle a defendant to acceptance of responsibility credit. Numerous courts have held that post-plea criminal conduct provides a basis to deny acceptance of responsibility credit. *See Mercado*, 81 F.4th at 353; *Ali*, 461 F. App'x at 48; *Chu*, 714 F.3d at 747–48. Russell also argues that because the government said it did not "have direct evidence" that Russell committed a crime, the government's claim is baseless. But the government made clear at the bail hearing "that there is circumstantial evidence" of criminal conduct and the Court agreed "there's circumstantial evidence[.]" Ex. A, Tr. 42-44. The Court already concluded, "at a minimum, [Russell] was attempting to engage in the same sort of crime that he has already been convicted of," *id.* at Tr. 68:5-11, and the evidence reflects Russell lied to pretrial services about the reason he went to the fitness centers. This is more than enough to establish by a preponderance of the evidence that Russell has engaged in post-plea criminal conduct. Russell should therefore not receive two levels of acceptance of responsibility credit under § 3E1.1(a). Because he is not entitled to acceptance of responsibility credit under § 3E1.1(a), he is not entitled to an additional one-level reduction under § 3E1.1(b).

    C. <u>The Zero-Point Offender Reduction is Not Applicable</u>

Russell contends that the zero-point offender reduction applies because "he has no criminal history points[.]" *See* Ex. B (PSR Objections). Under Guidelines § 4C1.1, a two-level offense reduction applies "[i]f the defendant meets all of the following criteria," which includes a list of ten criteria. One of the criteria is that "the defendant did not personally cause substantial financial hardship[.]" § 4C1.1(a)(6). But here, Russell stipulated that he "caused a substantial financial hardship to five or more victims," *see* Plea Agreement at 3, and therefore he does not qualify for the zero-point offender reduction even though he received no criminal history points.

III.    <u>A Substantial Term of Imprisonment is Warranted</u>

A substantial sentence of incarceration is warranted given the nature and seriousness of the defendant's criminal offenses, the defendant's history and characteristics and the need for general deterrence. *See* 18 U.S.C. § 3553(a). A sentence of time-served, as Russell requests, would in no way be consistent with the § 3553 factors.

    A. <u>Applicable Law</u>

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may

not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id.* at 50 (citation and footnote omitted).

The section 3553(a) factors include: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"

B. The Nature and Circumstances of the Offense

The nature and circumstances of Russell's offenses warrant a serious sentence. Russell's actions were not isolated lapses in judgment. Rather, for nearly two years, Russell defrauded nearly 30 investors out of at least $1.5 million. Russell had numerous opportunities to change his mind and abandon his fraudulent plans. Instead, he chose to defraud some of his close friends and colleagues. Russell went to great lengths to conceal his actions by fabricating bank statements and falsifying wire confirmations. And even when he knew he had no way to repay victims, he continued to make false promises. Even worse, around the same time that he defrauded investors, Russell stole at least 140 banks cards and identification cards from unsuspecting victims.

As illustrated by the following excerpts from victim impact statements, Russell's actions have caused many victims to suffer both financial and emotional distress:

- "The impact of being lied to by Rashawn Russell and losing $230,000 goes beyond loss; it is deeply personal and emotional. It has affected every aspect of my family life leaving myself and my wife feeling anger, hurt and an overwhelming sense of betrayal. I feel cheated out of what was mine deceived by someone I trusted and relied on and was violated in the process . . . I want him to pay the price for the pain, stress and loss he has caused me and my family. He []must be punished to the fullest extent of the law for taking other people's hard earned money for his own personal purposes." (Victim 5 statement, dated March 31, 2024).

- "This caused incredible tension and constant issues in my relationship with my father and mother at this point. They are constantly reminding me of the fact that I was dumb enough to invest with someone in this way and how I messed up our family's plans for retirement . . . As a result of losing more than $150K in assets at the time that I requested to withdraw funds, I had to move into small studio apartment . . . And I picked up part-time work in addition to my full-time job to gain additional skills. I have a lot of anxiety to try and make up for the lost money . . . I do feel that he will be a threat to the community, he has clearly shown no remorse about his actions. He refused to make payments in civil court. And he has been shameless on social media, making videos of himself at the gym or at restaurants. And for someone like that who shows no shame in his actions, I'm sure he would have no moral issues with committing a similar crime again." (Victim 10 statement, dated Feb. 1, 2024).

- "We trusted that this man was a licensed financial professional backed by a major financial institution who was responsible for his conduct.  I feel completed betrayed and find it difficult to be able to have trust again . . . This was a significant blow to my savings . . . Rashawn was a Bill and Melinda Gates foundation scholar.  One of the top High School students in the country . . . and a licensed financial professional . . . he knew EXACTLY what he was doing scamming us.  This was deliberate, tactical, and malicious in intent.  We demand justice, and we demand to be [made] whole again."  (Victim 34 statement, dated Sept. 25, 2023).

- "Rashawn Russell is evil and heartless.  He[] does not care for people.  I still see him post on social media as if all is well knowing he hurt so many people . . . I am hoping he reci[e]ves maximum sentence. . . I would never think he would do such a thing to a friend and [I] hope he receives the maximum sentence."  (Victim 48 statement, dated Oct. 11, 2023).

- "This criminal act has placed both my family and me under considerable financial strain.  It is disheartening that we placed our trust in an individual who held a professional financial license . . . We have already implemented cost-cutting measures on our personal expenses to the extent possible . . . This criminal act has inflicted both emotional and financial hardship on us for the extended duration."  (Victim 33, dated Oct. 9, 2023).

- "Some of the money invested are part of my parents' retirement savings.  Most of the money put into this was meant to be for buying my first home and my emergency fund savings.  Because of this, I've had to restart my savings, a chunk of my parents' retirement has been lost.  This has been detrimental to my financial stability and growth . . . the defendant took advantage of his relationships (family + friends) to take money[.]"  (Victim 37 statement, dated Jan. 7, 2024).

Defendant contends that the cryptocurrency market collapse that occurred "[b]efore the end of 2022 . . . due to the implosion of FTX" "impacted Mr. Russell's nascent fund and contributed to his conduct in the instant case in defrauding his investors." Dkt. 33 at 8-9.  Russell, however, began defrauding investors even before the cryptocurrency market began plummeting in November 2021 and FTX declared bankruptcy in November 2022.[4]  In February 2021 and May 2021, Russell texted investors fabricated bank account balance information to give them the false impression that he was highly successful.  PSR ¶ 20-21.  For example, Russell texted an investor a bank statement purporting to show about $1.2 million in one of his bank accounts—when, in fact, the account had a balance of less than $200.  PSR ¶ 21.  Russell continued to defraud investors after the cryptocurrency market dropped—but that is not when his fraud began, and those market events should not excuse his crime.

---

[4] *Embattled Crypto Exchange FTX Files for Bankruptcy*, N.Y. Times (Nov. 11, 2022), https://www.nytimes.com/2022/11/11/business/ftx-bankruptcy.html.

C. <u>Russell's History and Characteristics</u>

The history and characteristics of the defendant also weigh in favor of the imposition of a significant term of imprisonment. Russell reported a "'very loving" childhood "devoid of abuse of neglect" and "denied experiencing hardship in his adulthood." PSR ¶ 85, 88. Russell received a full-tuition scholarship to attend college and received a Bachelor of Science, *cum laude*, in 2008 from the School of Business at Babson College. *Id.* ¶ 99. During college, Russell had multiple internships. After college, Russell worked in investment banking in New York City, where he earned a substantial salary. *Id.* ¶ 106. Russell did not report suffering from any mental health conditions or substance abuse issues. *Id.* ¶ 94, 97.

Russell had every opportunity to lead a productive, law-abiding life: he is highly educated, and he had a good job with a substantial salary. Despite all of this, Russell chose to defraud investors in his cryptocurrency fund and to steal people's bank cards and identifications. "A crime of fraud by one who is otherwise successful, apparently by legitimate means, is also particularly disturbing." *United States v. Miell*, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010), *aff'd*, 661 F.3d. 995 (8th Cir. 2011). Further, although this is Russell's first criminal conviction, his conduct was not a single failure of judgment or momentary ethical lapse. As described above, Russell's conduct involved repeated, deliberate decisions that he made over a period of several years, including stealing over 100 bank cards and identification cards.

Russell reports that "his addiction to gambling" was a significant factor that led to his conduct here, Dkt. 33 at p. 9, but even assuming that is true, it does not excuse his conduct. First, Guidelines § 5H1.4 makes clear that "[a]ddiction to gambling is not a reason for a downward departure." For example, the Second Circuit held that there is "no authority requiring" a district court to consider a "gambling addiction" in imposing a sentence. *United States v. Yi Ching Liu*, 622 F. App'x 81, 82 (2d Cir. 2015). And separate from a departure, any purported gambling problem is not a significant mitigating factor under the § 3553 factors that supports a variance. *See United States v. Tahzib*, 513 F.3d 692, 694 (7th Cir. 2008) (finding no error where district court did not consider a gambling addiction as a mitigating factor in embezzlement case because the "[defendant's] gambling is selective and his decision to gamble or not to gamble or to gamble excessively or not to gamble excessively appears from the record to be something that is within his volition."); *United States v. Harotunian*, 920 F.2d 1040, 1047 (1st Cir. 1990) ("even if [defendant] did suffer from a gambling addiction (a diagnosis that the court viewed skeptically), the guidelines' general purpose of deterrence would be ill served by discounting appellant's sentence on this basis."). The Court should not place significant weight to any purported gambling addiction. Accordingly, the defendant's history and characteristics warrant a significant sentence.

D. <u>Affording Deterrence and Protecting the Public</u>

The Court should impose a significant sentence to afford adequate deterrence and protect the public. 18 U.S.C. § 3553(a)(2)(B), (C). This factor has two components: general and specific deterrence. General deterrence is an important sentencing factor in fraud and white-collar cases. Indeed, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." *United States v. Johnson*, No. 16-CR-457, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018). This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of

the punishments that may be imposed." *Id.* at *5; *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). It is therefore important here to impose a significant sentence to deter future similar fraudulent conduct. Indeed, the specific context of Russell's fraud underscores the need for deterrence. Cryptocurrency fraud has become a substantial problem. More than 46,000 people have reported losing over $1 billion in cryptocurrency to scams just since the start of 2021.[5] Through the sentence it imposes, this Court can and should send a clear message that the fraudulent exploitation of investors—be it though old-fashioned methods or by promoting new, cutting-edge technologies—will not be tolerated.

As for Russell's, access device fraud scheme, credit card fraud is also a significant problem in the United States. In 2022, "[n]early 40,000 Americans reported an instance of credit card fraud . . . up 23 percent from the year before."[6] This trend justifies a meaningful sentence being imposed to send a clear message to those who may be contemplating engaging in similar credit card fraud and identity schemes.

As to specific deterrence, Russell poses a significant recidivism risk that should be deterred by a substantial sentence of incarceration. Over the course of several years, Russell operated two separate fraud schemes—a cryptocurrency fraud and access device fraud. Even after being indicted and confronted with the imminent prospect of a substantial restraint on his liberty, he was not deterred: Russell continued his access device fraud scheme, causing the Court to ultimately revoke his bond. A substantial term of incarceration is therefore necessary not only to deter would-be fraudsters in general, but also to deter Russell from committing further crimes.

E. The Need to Protect Against Unwarranted Sentencing Disparities

The Court must fashion a sentence that avoids unwarranted sentencing disparities among similarly situated defendants. One of the principal purposes in establishing the Sentencing Guidelines was to create, through within-Guidelines sentences, "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar criminal offenders." U.S.S.G. Ch. 1., Pt. A(1)(3).

The United States Sentencing Commission's Judiciary Sentencing Information ("JSIN") tool compiles national sentencing outcomes using an offender's primary guideline, offense level,

---

[5] *Reports show scammers cashing in on crypto craze*, Federal Trade Commission, https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze (published June 3, 2022)

[6] Chris Velazco, *Washington Post*, Credit card fraud isn't going anywhere, https://www.washingtonpost.com/technology/2023/08/02/credit-card-fraud-tips-ai/ (published Aug. 2, 2023).

the punishments that may be imposed." *Id.* at *5; *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). It is therefore important here to impose a significant sentence to deter future similar fraudulent conduct. Indeed, the specific context of Russell's fraud underscores the need for deterrence. Cryptocurrency fraud has become a substantial problem. More than 46,000 people have reported losing over $1 billion in cryptocurrency to scams just since the start of 2021.[5] Through the sentence it imposes, this Court can and should send a clear message that the fraudulent exploitation of investors—be it though old-fashioned methods or by promoting new, cutting-edge technologies—will not be tolerated.

As for Russell's, access device fraud scheme, credit card fraud is also a significant problem in the United States. In 2022, "[n]early 40,000 Americans reported an instance of credit card fraud . . . up 23 percent from the year before."[6] This trend justifies a meaningful sentence being imposed to send a clear message to those who may be contemplating engaging in similar credit card fraud and identity schemes.

As to specific deterrence, Russell poses a significant recidivism risk that should be deterred by a substantial sentence of incarceration. Over the course of several years, Russell operated two separate fraud schemes—a cryptocurrency fraud and access device fraud. Even after being indicted and confronted with the imminent prospect of a substantial restraint on his liberty, he was not deterred: Russell continued his access device fraud scheme, causing the Court to ultimately revoke his bond. A substantial term of incarceration is therefore necessary not only to deter would-be fraudsters in general, but also to deter Russell from committing further crimes.

E. The Need to Protect Against Unwarranted Sentencing Disparities

The Court must fashion a sentence that avoids unwarranted sentencing disparities among similarly situated defendants. One of the principal purposes in establishing the Sentencing Guidelines was to create, through within-Guidelines sentences, "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar criminal offenders." U.S.S.G. Ch. 1., Pt. A(1)(3).

The United States Sentencing Commission's Judiciary Sentencing Information ("JSIN") tool compiles national sentencing outcomes using an offender's primary guideline, offense level,

---

[5] *Reports show scammers cashing in on crypto craze*, Federal Trade Commission, https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze (published June 3, 2022)

[6] Chris Velazco, *Washington Post*, Credit card fraud isn't going anywhere, https://www.washingtonpost.com/technology/2023/08/02/credit-card-fraud-tips-ai/ (published Aug. 2, 2023).

criminal history category, and resulting guideline range of imprisonment.[7] In fiscal years 2019-2023, for the 115 criminal fraud offenders sentenced under Guideline § 2B1.1, with an offense level of 29 and a criminal history category of I (excluding defendants who received a § 5K1.1 for substantial assistance)—the same as Russell—98% received a sentence of imprisonment and the average length of imprisonment for the 113 defendants who received a sentence of imprisonment was 65 months.  These statistics show that to avoid unwarranted sentencing disparities, a substantial sentence of imprisonment is warranted.  Conversely, a sentence of time-served would result in unwarranted sentencing disparities.[8]

IV.    Restitution

The Court should impose restitution of $1,522,494.95 under the Mandatory Victim Restitution Act, as agreed in the plea agreement and as set forth in the government's proposed restitution order.  *See* Dkt. 23.   The government is not seeking forfeiture.

V.    Conclusion

For these reasons, the government requests the Court sentence Russell to a substantial term of incarceration, three years of supervised release, and order him to pay $1,522,494.95 in restitution.  The Court defers to the Court on any fines.

Respectfully submitted,

| | |
|---|---|
| GLENN S. LEON<br>Chief, Fraud Section<br>Criminal Division, Department of Justice | BREON PEACE<br>United States Attorney<br>Eastern District of New York |
| */s/ Kyle Crawford*<br>Kyle Crawford, Trial Attorney<br>Fraud Section, Criminal Division<br>United States Department of Justice | */s/ Drew Rolle*<br>Drew G. Rolle<br>Assistant United States Attorney |

---

[7] *Judiciary Sentencing Information*, United States Sentencing Commission https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited April 30, 2024).

[8] In support of his request for a sentence of time-served, Russell also cites the conditions at the Metropolitan Detention Center, Dkt. 35 at 10, where he has been incarcerated since February 27, 2024.  Dkt. 32.  Russell will have been incarcerated at MDC for a little over two months by the time of his sentencing.  He identifies no case in which a court sentenced a defendant to time served when the applicable Guidelines were anywhere near the 87 to 108 months applicable here.  A sentence of time served would be inconsistent with the § 3553 factors.

cc:	U.S. Pre-Trial Services Office (by E-mail)